105 N.J. Super. 132 (1969)
251 A.2d 310
JACK McMINN AND ANNA M. McMINN, HIS WIFE, PLAINTIFFS,
v.
JAMES P. DAMURJIAN AND MARY A. DAMURJIAN, HIS WIFE, DEFENDANTS,
v.
CHICAGO TITLE INSURANCE COMPANY, HOME TITLE DIVISION, AND CHELSEA TITLE & GUARANTY COMPANY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 13, 1969.
*133 Mr. Leonard Rothman, attorney for plaintiffs.
Mr. Alfred D. Fierro, attorney for defendants Damurjian.
*134 Mr. Bernard Dorfman, attorney for third-party defendant Chicago Title Insurance Company, Home Title Division (Mr. Elliot W. Urdang appearing).
Mr. John R. Weigel, attorney for third-party defendant Chelsea Title & Guaranty Company.
LORA, J.S.C.
This action was originally instituted by plaintiffs Jack and Anna McMinn for injunctive relief against alleged encroachments and continuing trespass by their neighbors James P. and Mary A. Damurjian who had removed a portion of plaintiffs' concrete rear entrance platform and who were breaking up plaintiffs' walk, claiming it encroached on their property. The title companies were brought into the case as third-party defendants.
After pretrial conference all parties agreed to be bound by an independent survey which, when completed, disclosed plaintiffs and not the Damurjians were, in fact, the encroachers. Consequently, there remained for disposition by this court only plaintiffs' damage claims under the title policy which had issued to them by the Chelsea Title & Guaranty Company.
Defendant title company during trial consented to a judgment for the reasonable cost of replacing the walk and platform within the newly established property lines, which costs of $200 and $350, respectively, were testified to at the trial and agreed to as being reasonable and necessary.
Plaintiffs, however, seek additional damages by way of counsel fees and expenses incurred in connection with this litigation, and for diminution of property and market value due to reduction in the area of the side yard concomitant upon the binding independent survey. Defendant title company contends there is no liability for these additional claims since plaintiffs instituted a baseless suit against the Damurjians and the policy requires only that the insurer defend, not institute, an action; it is defendant's further contention that the independent survey has confirmed that plaintiffs *135 do have title to a 50-foot lot and hence there has been no actual loss of total area, albeit the side yard has been narrowed. Furthermore, defendant contends the policy says nothing about reasonable access and egress, and the title policy survey extends only to structures as set forth therein; that the survey referred to in the policy does not show a side entrance into plaintiffs' house and the location of the house on the survey, and in fact is within the plaintiffs' property lines.
There are three surveys here involved, the first of which was shown to plaintiffs at the closing of title by the closing attorney. That survey was thereafter superseded by a second survey, referred to in the rider to the policy and which shows a side yard of 3.56 feet at the front of plaintiffs' house and 3.57 feet at the rear thereof, while the independent or binding third survey shows the side yard to be 2.59 feet at the front of the house and 2.55 feet at the rear. It follows the side yard is actually 1.02 feet narrower than shown on the second survey.
The Mc Minns had wanted to erect a fence along the property line to protect an infant daughter from the potential danger of a 12-inch drop between their property and that of the Damurjians.
However, plaintiffs' side entrance door opens up on steps leading to the cellar and steps running up to the second floor. The side door was, before this suit and binding determination of the property line, used by plaintiffs to take out and bring in items such as a baby carriage and lawn mower which are stored in the cellar, there being no garage. The 30-inch door clears the new property line by only 1 inch, the total side yard now being only 2.55 feet, and hence such items can no longer be taken in or out of the door without trespassing on the neighbors' property. Then, too, if a fence were erected, the door which swings outward and which cannot open inward because of the inside steps could not be opened all the way.
In any event, it is clear that any access or egress is considerably more difficult due to the loss of the one foot of side *136 yard. True, the survey which plaintiffs saw for the first time at the closing of title in January, 1967 showed a side yard of only 2.80 feet at the front of the house and 3.00 feet at the rear, but it did indicate plaintiffs' walk was entirely within their property line and the rear platform was only 0.33 feet over. It is not clear why the title company did adopt the second survey, but they did do so by the aforesaid rider to the policy.
I give credence to the uncontradicted testimony of the expert witness Alexander Mc Mahon, a carpenter-contractor produced by plaintiffs, and find that the problem of ingress and egress can be resolved by replacing the present side door with a new one on the south side of the house. This alteration would also require construction of a drain and eight to ten feet of walk with an apron to link up with the rear walk, all of which would and could be done at a cost of $410. (Plaintiffs produced no evidence as to loss in market value, but if the defendnat title company is liable, it is this court's opinion that the reasonable cost of the remedy is an acceptable, alternative method of computing damages.)
Under the terms of the policy Chelsea Title and Guaranty Company agreed to "indemnify, keep harmless and guarantee * * * from all loss or damage not exceeding the amount of insurance * * * by reason of defects in the title of the Party Guaranteed to the estate, mortgage, or interest described in Schedule A * * * or because of liens or incumbrances * * *; saving the estates, defects, objections, liens and incumbrances except in Schedule B * * *".
Schedule B of the title insurance policy dated January 18, 1967 sets forth a list of exceptions from coverage. The survey of November 22, 1966 was incorporated into Schedule B as Item 10, which was amended on October 31, 1967 to substitute the revised survey of October 27, 1967 for the earlier one. Said rider reads:
"The above policy is hereby amended as follows: Item 10 of Schedule B is to read as follows: Subject to facts shown on survey *137 * * * which discloses: encroachment of fence along northwesterly rear portion of subject premises."
The revised survey thus became an integral part of the contract. Broadway Realty Co. v. Lawyers' Title Ins. & Trust Co., 171 App. Div. 792, 157 N.Y.S. 1088 (App. Div. 1916). Said revised survey shows no encroachments by plaintiffs' concrete platform and side walk on the Damurjians' property, and shows the west side yard is 3.55 feet wide at the rear of plaintiffs' dwelling and 3.56 feet wide at the front. Defendant contends the side yard discrepancy is not covered since it does not constitute a title defect.
Research of both counsel and the court has not revealed any New Jersey cases dealing with the issues here involved.
In Pennsylvania Laundry Co. v. Land Title and Trust Co., 74 Pa. Super. Ct. 329 (1920) the policy read:
"Saving such estates, defects, objections, liens and encumbrances as may be set forth in Schedule B, or excepted by the conditions of this policy hereto annexed and hereby incorporated in this contract."
Schedule B set forth the defects and encumbrances which were excepted out of the covenants of the policy and against which the defendant did not undertake to indemnify the assured and went on to say:
"Accuracy of descriptions and dimensions and any other objections which an official survey would disclose * * * Lot insured partly fenced and fence on the east off the line and encroaches on Lot insured."
A year or so later plaintiff laundry company secured a survey and began construction in accordance with such survey. Thereupon the owners of property adjoining the western line of the lot filed suit claiming they had acquired by adverse user the right to use as a passageway a strip of ground 2' 6" wide along the westerly portion of plaintiff's lot. The title company declined to defend on the ground that the *138 claim fell within the exception of defects which an official survey would disclose.
The court held that it very clearly appeared by the covenants of the policy that the physical conditions existing upon the ground were within the contemplation of the parties, for it was plainly stipulated that one of the encumbrances for which defendant would not be liable was any that might arise out of the fact that the fence to the east was off the line and encroached on the lot insured. The Pennsylvania court went on to say:
"The plaintiff was the owner of this property at the time the policy issued, the defendant covenanted for a valuable consideration to indemnify it against defects in title or encumbrances which might impair its value and the deprivation of the right to use a part of the property for the purposes which the plaintiff contemplated was a loss for which the plaintiff is entitled to be indemnified: Foehrenback v. German-American Title & Trust Co., 217 Pa. 331. The appellant contends, however, that even if the plaintiff is entitled to recover it can only recover the value of the strip of ground taken and the cost of defending the equity proceeding: Anderson's Admrs. v. Washabaugh, 43 Pa. 115; Robinson v. Bakewell, 25 Pa. 424. The rule undoubtedly is that the plaintiff in such a case is entitled to be reimbursed for the loss sustained: German-American Title & Trust Co. v. Citizens' Trust & Surety Co., 190 Pa. 247. When a property consists of farming land one acre of which is as valuable as another, then if a corner of the farm be lost, the measure of damages is the value of the part lost. When, however, we come to consider the case of city lots which are to be used for building purposes, it is very clear that the mere value of the strip of ground taken is not the proper measure of damages. A strip of ground three feet wide taken out of the middle of a twenty-foot building lot would diminish the value of the parts thus separated. The alley in question in the present case not only diminished the width of the front on Wallace Street, but rendered it necessary to make an offset in the west wall of the building, thus adding to the cost of construction. Anything which renders it necessary to spend more money in using a lot impairs the value of the land. All the specifications are overruled."
Cf. Kuhlman v. Title Ins. Co. of Minnesota, 177 F. Supp. 925 (W.D. Mo. 1959) for a fact pattern most similar to that of the case at bar, but where the defect was effectively excepted from insurance coverage. The title policy there *139 provided that it did not insure against "facts which would be disclosed by an accurate survey of the premises herein described." Some time after the purchase of the tract plaintiffs erected an industrial building thereon with a 60-foot clearance between its loading dock and what they thought to be their east boundary line, to permit the largest of trucks to load and unload at the loading dock.
Prior to erecting the building plaintiffs had caused a survey of the land to be made which located their east and west boundary lines. It was with this survey in mind that they designed and located the building.
Thereafter the purchaser of the land adjoining plaintiffs' east boundary line caused a survey to be made which revealed the true boundary was approximately 3.25 feet west of where plaintiffs had supposed it to be and which had been designated by their survey. Plaintiffs' neighbor erected a fence which left only 57 feet clearance within which trucks could approach the loading dock. All parties agreed that the neighboring owner's survey was the correct one.
The Kuhlmans contended their property had been damaged because the 57-foot area was not sufficient to enable trucks to load and unload properly at their dock, and they sued to recover the face value of their title policy issued by defendant insurer against defects of title to the premises. However, the court held defendant was under no obligation to cause a survey to be made prior to the issuance of the policy; that it insured title only to such property as plaintiffs actually acquired, and that the exclusionary clause was binding upon them.
Blacks Law Dictionary (4th ed.), p. 506, defines a defect as "[t]he want or absence of something necessary for completeness or perfection; a lack or absence of something essential to completeness; a deficiency in something essential to the proper use for the purpose for which a thing is to be used." (Emphasis added)
The title company's reliance on the fact that the plaintiffs have actually lost no land area (retaining their *140 50-foot frontage) is unpersuasive in light of the nature of plaintiffs' claim. The damage claimed is the restricted if not precluded use of the entrance facing the westerly side yard. It is the westerly strip of land which is in dispute and to a portion of which plaintiffs have been shown to lack title. The fact that plaintiffs may have an additional one-foot strip along their easterly property line can in no way serve to alleviate the damage complained of. The title defect complained of is as to the particular one-foot strip on the westerly property line.
The court finds that the restricted use of plaintiffs' side entrance constitutes a title defect, and is accordingly covered by the policy. Since this defect did not appear on the revised "Location Survey" of October 27, 1967, it was not excepted from coverage by the terms of the policy and more particularly Schedule B thereof.
When defendants Damurjian began to destroy the McMinns' side walk, plaintiffs requested their title company to take action against the Damurjians. However, the company declined to act, whereupon plaintiffs instituted this action for injunctive relief against the Damurjians. Plaintiffs now claim damages for counsel fees and costs incurred in prosecuting this action which they allege should have been undertaken by defendant Chelsea pursuant to the insurance contract. The policy states:
"Chelsea Title and Guaranty Company will at its own cost defend the party guaranteed in all actions of ejectment or other proceedings founded upon a claim of title or incumbrance prior in date to this Guaranty, and hereby guaranteed against. No claim shall arise under this Guaranty unless (1) the party guaranteed has been actually and lawfully evicted from the premises covered by this Guaranty or from some part or undivided share or interest therein under an adverse title guaranteed against or (2) there has been a final judgment or decree against the party guaranteed upon or because of a defect, lien or incumbrance not excepted in this Guaranty; * * *."
Defendant title company argues that plaintiffs' claim cannot be sustained because the policy of title insurance is one *141 of indemnity and the terms of the contract do not obligate it to undertake the prosecution of an action but only to defend the insured, and because the action against the Damurjians was baseless in fact.
In Lawyers Title Ins. Corp. v. McKee, 354 S.W.2d 401 (Tex. Civ. App. 1962), the insured brought a trespass action against his neighbor, who claimed two acres of land which appeared by survey to belong to the insured. Prior to institution of the trespass action, plaintiff insured called upon his title company to clear his title, but the company did nothing. Appellant insurance company also declined the insured's request to defend title in his trespass action, which finally was adjudicated against plaintiff and resulted in divesting him of his claim of title to the two acres involved. The insured thereafter brought suit against his insurer to recover the sum to which he was entitled, plus expenses and counsel fees incurred in the trespass action.
The Texas court framed the issue as follows:
"Third Question: Is the Title Company obliged, in an instance where its insured files a trespass to try title suit to recover the title to real estate which is covered by its policy of title insurance, to furnish at its own cost the expense necessarily incident to the prosecution of the suit as `a defense of the assured on a claim against or right to said land, or a part thereof, adverse to the title guaranteed'? We hold that it is ordinarily so obliged, and was in the instant case."
The policy in Lawyers Title stated that the company: "[s]hall, at its own cost, defend said assured in every suit or proceeding on any claim against or right to said land, or any part thereof, adverse to the title hereby guaranteed * * *."
Judgment for the insured was affirmed on the ground that the import of the guaranty clause was for the defense of the title which was insured, and not confined solely to the insureds being a defendant in a legal action; that "his right to title was cast in issue the moment the defendants in said suit filed their answer and plead `not guilty.'" (354 S.W.2d, at p. 407.)
*142 It is my opinion the reasoning of the Texas court is sound  the import of the indemnification extends to the insured's title. Accordingly, it would be unreasonable to construe the indemnity as not covering the precise situation which exists here where the Damurjians employed self-help rather than legal process in destroying plaintiffs' property and claiming title thereto. Such action by the Damurjians effectively put plaintiffs' title in dispute. At this point it was incumbent upon the McMinns' title company to defend that title, but it refused to do so. It is immaterial that the McMinns' claim against the Damurjians proved to be baseless; the fact remains that defendant did nothing to protect plaintiffs' title when it was put in dispute.
An award of damages against the title company for reasonable counsel fees incurred by plaintiffs in the proceedings against the Damurjians is predicated on its contractual obligation to defend title and a breach of its indemnity contract, and is therefore not interdicted by R.R. 4:55-7. Verhagen v. Platt, 1 N.J. 85, 91-92 (1948); cf. Jersey City Sewerage Authority v. Housing Authority of Jersey City, 70 N.J. Super. 576, 584 (Law Div. 1961).
Plaintiffs proceeded against their title company by way of third-party complaint (perhaps, more properly, an amended complaint). However, counsel fees incurred in connection with that third-party action and that phase of the total litigation, are distinguishable. Such counsel fees do not derive from the aforesaid contractual obligation; hence they are governed by R.R. 4:55-7 and may not be allowed. See Lawyers Title, supra, 354 S.W.2d, at p. 407.
The only testimony on counsel fees adduced at the trial concerned the retainer agreement between plaintiffs and their attorney Leonard Rothman which provided for payment "on a time basis for conferences, telecalls, appearances in court, and preparing and processing complaint and order to show cause against the Damurjians." The agreement further recited that plaintiffs had paid the sum of $250 as a retainer and part payment towards his legal services.
*143 Since there was no proof as to the extent of the legal services rendered nor the reasonable value thereof, despite said issues being raised in the pretrial order, the court is constrained to limit such recovery to the $250 paid at the time of the retainer, which sum is a bare minimum fee under any conceivable circumstances. See Bergen Builders, Inc. v. Horizon Developers, Inc., 44 N.J. 435, 438 (1965), Cohen v. Fair Lawn Dairies, Inc., 44 N.J. 450, 452 (1965).