202 N.J. Super. 58 (1985)
493 A.2d 1288
ROBERT E. ENRIGHT AND ROSEMARY S. ENRIGHT, HIS WIFE, PLAINTIFFS-RESPONDENTS, AND CROSS-APPELLANTS,
v.
HAROLD W. LUBOW AND RYNA LUBOW, HIS WIFE, DEFENDANTS-RESPONDENTS, AND U.S. LIFE TITLE INSURANCE CO. OF NEW YORK, A CORPORATION OF N.Y., DEFENDANT-APPELLANT, AND CROSS-RESPONDENT, AND EARLE BAILEY, P.E. & ASSOCIATES, DEFENDANT-RESPONDENT, AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1984.
Decided May 30, 1985.
*63 Before Judges KING, DEIGHAN and BILDER.
Ben J. Slavitt argued the cause for appellant and cross-respondent U.S. Life Title Insurance Co. of New York (Slavitt, Fish & Cowen, P.A., attorneys; Ben J. Slavitt and Ronald C. Schecter, on the brief).
Donald L. Minassian argued the cause for respondents and cross-appellants Robert E. Enright and Rosemary S. Enright, his wife (Draesel, Sunshine, Atkins and November, attorneys; Donald L. Minassian, on the brief).
Paul V. Strawinski argued the cause for respondent and cross-appellant Earle W. Bailey, P.E. & Associates (Organ & Strawinski, attorneys; Paul V. Strawinski, on the brief).
Harold M. Cohen argued the cause for respondents Harold W. Lubow and Ryna Lubow, his wife.
The opinion of the court was delivered by DEIGHAN, J.A.D.
This action concerns the rights and liabilities between an insured and the insurer under a title insurance policy and whether a survey has been excepted or excluded from coverage under the title policy; if not, the issue as to proper measure of damages must be determined where the survey erroneously locates an easement. Also involved is the question of whether *64 under the facts and circumstances of this case, the insured may recover punitive damages and attorney's fees against the insurer. The rights and liabilities of the prospective purchasers and the surveyor are also brought into focus as well as crossclaims for indemnity by all of the defendants against each other.
Plaintiffs Robert E. and Rosemary S. Enright (Enrights) as owners and sellers of real estate filed this action against defendants Harold W. and Ryna Lubow (Lubows), prospective purchasers; Earle W. Bailey, P.E. & Associates (Bailey), a land surveyor, and U.S. Life Title Insurance Co. of New York, a corporation of New York (Title Company), the title insurer. The Enrights sued the Lubows as buyers for breach of contract to purchase the property; Bailey for negligence and breach of warranty in the preparation of a survey for the property, and Title Company on a policy insuring title to the property.
The Lubows counterclaimed against the Enrights for rescission of the contract and damages resulting from the Enrights' failure to convey title free of defects. The Lubows also crossclaimed against Bailey and the Title Company for indemnification. The Title Company also crossclaimed against Bailey and the Lubows for indemnification and Bailey crossclaimed against the Lubows and the Title Company for indemnification.
After a seven-day bench trial, the trial judge found that a utility right-of-way was located six feet from the Enrights' home rather than 50 feet as appeared on the survey by Bailey and insured by the Title Company. He awarded compensatory damages in favor of the Enrights and against the Title Company for $22,000 plus $18,438.81 interest and $15,000 counsel fees for total compensatory damages of $55,438.81. He further awarded $30,000 punitive damages in favor of the Enrights against the Title Company for a total judgment of $85,438.81.
In addition, the trial judge awarded damages in favor of the Lubows against the Title Company comprised of a mortgage application fee of $200; engineer's inspection fee $195; termite inspection $37; insurance fees $20; attorney's fees for attendance *65 at the closing $500, and attorney's fees during the course of litigation $2,500, for a total amount of $3,452 compensatory damage.
The facts in this matter are complex, and, not surprisingly, in many respects disputed. In the summer of 1978 the Enrights bought a home in Montvale, New Jersey. Their attorney, Joseph Higgins, Jr., ordered a title insurance policy from John Lyons of Inter-County Abstract, an agency of U.S. Life Title Insurance Co. of New York. Higgins also ordered a survey of the property from Bailey. The property was traversed by utility easements owned by Tennessee Gas Co. and Rockland Electric Co. Instead of plotting a metes and bounds description to locate the easement on the survey, Bailey merely protracted the utility easement from a previously filed map. The easement was incorrectly plotted on the original map and the mistake was reproduced on Bailey's survey. It is this error which gave rise to the present litigation.
Prior to settlement of the property in 1978, the Enrights were aware of the power lines and utility poles on the property and discussed the easement with the prior owners. They were shown a copy of Bailey's survey which erroneously plotted the location of the easement; neither the Enrights nor the title company knew of the error. The power lines and utility poles were actually located a considerable distance from the house.
The Enrights were not aware of any problem concerning the utility easement until February 1980. At that time they received notice from Rockland Electric that they were going to trim vegetation under the power lines. When a Rockland Electric employee told the Enrights that the electric company would be cutting down trees near their home, the Enrights became suspect that there might be a problem with the location of the easement. When they told the employee that the trees which were to be cut down were not within the easement they were assured that Rockland Electric would check into the matter before cutting the trees.
*66 At this time Mr. Enright was transferred to Virginia and, in fact, was already living there. Inasmuch as the Enrights were required to relocate in Virginia, on March 10, 1980 the property in Montvale was listed for sale with a real estate broker. On March 22, 1980 the Enrights signed a contract to buy a home in Arlington, Virginia. Although the original contract did not schedule a settlement date, the settlement was subsequently scheduled for October 6, 1980. On March 30, 1980 they signed an agreement to sell their home in Montvale to the Lubows.
On May 7, 1980 Lyons of Inter-County issued a certificate or report of title binder dated April 16, 1980 to the Lubows. The binder guaranteed title to the property and had a copy of the erroneous Bailey survey annexed. The binder required only that insofar as the survey exception is concerned, an "affidavit of no structural change" need be furnished for the issuance of a title policy. On May 15, 1980 the Lubows appeared prepared to consumate settlement. Susan Spiro, a paralegal from the claims office of the Title Company, appeared at settlement. She advised that the Title Company had ordered another survey from Bailey which had not been received. She stated that the Title Company would not insure the location of the easement until it was satisfied as to the accuracy of the survey. In light of this the Lubows refused to complete settlement on the property.
Other facts will be developed relevant to discussion of the issues involved.
The Title Company contends that (1) it is not liable to the Enrights for equitable fraud; (2) the Enrights are precluded from recovery because of their failure to timely notify it of the easement problem; (3) the Enrights are estopped from recovery of damages in that they "created, suffered, assumed or agreed to" an encumbrance by entering into an agreement with the Lubows; (4) it was not guilty of negligence in issuing the title policy in 1978; (5) the easement is excluded and excepted from coverage under the title policy; (6) the court erred in (a) *67 awarding punitive damages to the Enrights, (b) awarding counsel fees to the Enrights and the Lubows, and (c) failing to award indemnity in favor of the Title Company against Bailey for the full amount of the judgment entered against it.
The Enrights propose that the trial judge erred by failing (1) to include certain damages in the judgment; (2) to award adequate punitive damages, and (3) to award adequate counsel fees. Bailey maintains that the Title Company is (1) solely liable or jointly liable for mislocation of the easement, and (2) not entitled to full indemnity. Bailey further contends that judgment must be entered against Earle Bailey, P.A. & Associates, Inc., a corporation, and not against him individually.
Initially, a title insurance policy is a contract of indemnity under which the insurer, for a valuable consideration, agrees to indemnify the insured in a specific amount against loss through defects of title to, or liens or encumbrances upon, realty on which the insured has interest. Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 478-79 (1962). A report of title is a "binder", i.e., a binding receipt affording coverage pending the agreed issuance of a policy under which the title company agrees to "guarantee" the title subject only to specifically noted and listed "estates, liens, defects and questions." Caravan Products Co., Inc. v. Ritchie, et al., 55 N.J. 71, 75 (1969).
The definition and the function of a report of title is set forth in 13 N.J.Practice (Lieberman, Abstracts and Titles), (3 ed. 1966), § 226 at 147:
Perhaps, however, the most important feature of the Preliminary Title Report is the agreement usually therein, by the title company, that it will insure the applicant for any loss up to the amount stated, subject, of course, to the terms and exceptions in the report; sustained by reason of the failure of the report to reflect the title; and to issue a title policy upon the closing of title. In this way, the insured may safely proceed with the closing of title or mortgage loan, as the case may be, on the basis of such preliminary report.
Consistent with the nature of a title insurance policy and a report of title, "the liability to [the insured] is contractual and does not depend upon negligence." Caravan Products Co., Inc. v. Ritchie, et al., supra, 55 N.J. at 74; see also Booth v. *68 N.J. Highway Authority, 60 N.J. Super. 534, 438 (Law Div. 1960); 13 N.J.Practice, supra, § 222 at 142; 7 Powell, Law on Real Property, ¶ 1042 at 90-30.
We now turn to the multiple issues raised by the parties. Initially, in his conclusions the trial judge found that the Enrights sustained damages, among other grounds, as a result of the Title Company's negligence. The Title Company contends it was not negligent in issuing the 1978 title insurance policy to the Enrights or in its conduct surrounding the 1980 Lubow binder. The only negligence issue in the pretrial order is that of the surveyor Bailey. From our review of the record we conclude that the Enrights' basic claim against the Title Company was contractually based upon the title insurance policy issued in 1978, not negligence. Their negligence claim is based on the activities surrounding the issuance of the binder to the Lubows in 1980 which will be dealt with below.

The Policy Insures the Accuracy of the Survey
Because it underlies all other issues, we initially consider whether the easement is excluded or excepted from coverage under the title insurance policy issued to the Enrights on July 20, 1978. Schedule A generally insures the title of the Enrights; Schedule B lists the following exclusions:
This policy does not insure against loss or damage by reason of the following:
* * * * * * * *
2. Survey made by Earle W. Bailey, dated June 23, 1978 shows 2 story frame dwelling with attached 2 car garage, location of driveway, walkway, concrete pad, patio, 50 ft. gas and electric right of ways. No variation or encroachments.
In MacBean v. St. Paul Title Insurance Corporation, 169 N.J. Super. 502 (App.Div. 1979), 8 A.L.R.4d 1238 (1979), this court interpreted an alleged exclusion of a survey under a title insurance policy. In MacBean the printed form of policy also contained the same type of exception under Schedule B:
This policy does not insure against loss or damage by reason of the following:
* * * * * * * *

*69 3. Survey: Any encroachments, measurements, party walls, or other facts which a correct survey of the premises would show. [169 N.J. Super. at 505].
This exclusion for coverage was then expressly omitted by a typewritten addendum.
7. Item No. 3 of Schedule "B" is omitted in its entirety. [Ibid.].
Followed by another typewritten provision:
8. Survey made by Robert Towns Clymer & Associates, L.L.S., dated April 12, 1973, shown clear. [Ibid.].
Although we held that the survey was thus incorporated by reference into the title policy, the record was unclear whether the survey was physically attached to the policy. Ibid. In the present case the survey was attached to and thus incorporated into the title policy and became an integral part of it. See McMinn v. Damurjian, 105 N.J. Super. 132, 137 (Ch.Div. 1969).
In MacBean we held that the title insurers' liability was governed by the reasonable expectation of an average lay purchaser of insurance. Id. 169 N.J. Super. at 507. The doctrine of "reasonable expectation" which was expressed in Kievit v. Loyal Product. Life Ins. Co., 34 N.J. 475, 482 (1961), had previously been held applicable to title insurance policies. Sandler v. N.J. Realty Title Ins. Co., supra, 36 N.J. at 479. The "reasonable expectation" principle applies to misleading terms and conditions of insurance contracts and is also based on the doctrine that genuine ambiguities are resolved against the insurer. DiOrio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257, 269 (1979).
Here the survey exclusion at best is ambiguous and at worst misleading. Lyons, the attorney and head of Inter-County Abstract as well as attorney for the Title Company, maintained that the title insurance policy only insures the boundary of the survey but does not insure locations within the survey itself. Therefore, he opined, the survey would not insure the distance of the house to the sidelines and the location of the easement on the survey. He admitted that there is no language or specific exception in the binder indicating the Title Company would not insure the survey or locations.
*70 Joseph Higgins, plaintiffs' attorney at settlement, testified that the policy of insurance actually insures the survey as correct. On this basis, the Enrights would have a claim for any errors, deficiencies or mistakes arising from the inaccuracy of that survey.
We hold that the title insurance policy issued to the Enrights insures against loss by virtue of any errors or mistakes contained in the survey made by Bailey dated June 23, 1978 attached to the policy. Our determination is based upon the reasonable expectation of the insureds that the purpose of requiring a survey is not only to locate the outbound lines of the survey but also to insure its accuracy in the location of those conditions which are shown within the boundaries of the survey.
Our conclusion is based, not only upon reasonable expectation, but also customs of title insurance companies and construction of the policy itself. Schedule B in the usual form of title insurance policy contains a list of encumbrances, liens, defects and exceptions against which the title company will not guarantee and which are excepted from the policy. See 13A N.J.Practice, supra, § 244 at 158. Since a survey indicates the possibility of future difficulties with regard to property, title guaranty companies, almost without exception, issue their policy of guarantee subject to conditions shown by a survey or if no survey was made, then subject to such condition as an accurate survey of property will disclose. 13A N.J.Practice, supra § 1701 at 194.
We note that the "certificate of title" or report of title issued by the Title Company follows this practice and procedure. Item 5 of Schedule B of the certificate of title sets forth the survey exception:
5. Matters of survey: Any state of facts which an accurate survey or inspection of the premises would disclose or Survey made by ...
It makes little sense to contract to insure a title subject to "[a]ny state of facts which an accurate survey or inspection of *71 the premises would disclose ..." and then, when a survey is received, to issue a policy with the survey attached stating that the survey is excluded! The only possible interpretation of the exclusion is that the survey is not excluded but that it is informational; otherwise, it would hardly be incorporated into the policy in order to be excluded. The survey is recited and annexed to the policy to show the fact of the survey. If there are any deficiencies or defects shown on the survey they are noted after the recital of the survey; it is those deficiencies or defects which are excepted or excluded, not the survey itself. Here, the exclusion notes that there are "[n]o variations or encroachments." Clearly, this is an assurance that the accuracy of the survey is insured and that there are no defects or errors reflected on the survey.
The trial judge properly held that the title policy insured the location of the right-of-way as shown on the Bailey survey.

Preclusion of Enrights from Recovery Under the Policy
The Title Company contends that it did not receive notice of the claim until March 31, 1980 after receipt of the Enrights' letter of March 27, 1980; that the Enrights orchestrated a scheme to induce the Lubows to take title with the power easement located five feet from the house; that the Enrights by entering into the contract drastically compounded the compensatory damages to the amount of $55,431.81, and that the Enrights were the sole cause of excessive damage. We reject the conclusion that the Enrights are precluded from recovery and that they are estopped from recovery of damages because they created an encumbrance by entering into the agreement with the Lubows. Both of these events occurred after issuance of the title policy and would only have a bearing, if any, upon damages which will be discussed below.

Equitable Fraud
The trial judge found

*72 that the Title Company was aware of the error and attempted to perpetuate said error of the survey. That the Title Company breached its contract with the Enrights and attempted to avoid its responsibility to its insured.
That the Title Company was guilty of equitable fraud since it endeavored to perpetuate the error by issuing a certificate to Lubows knowing it to be inaccurate.
The trial judge awarded both compensatory and punitive damages predicated upon findings of breach of contract, negligence, presumably equitable fraud and deceit. To the extent that he awarded any damages based on equitable fraud, the trial judge erred. Legal fraud or misrepresentation consists of five elements: (1) a material representation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the other person relied on it; (4) reasonable reliance thereon by the other person, and (5) resultant damage. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619 (1901); Foont-Freedenfeld v. Electro-Protective, 126 N.J. Super. 254, 257 (App.Div. 1973), aff'd 64 N.J. 197 (1974); Prosser & Keeton, Law of Torts (5 ed. 1984), § 105 at 728. However, equitable fraud does not require the element of scienter, knowledge of the falsity and an intent to obtain an undue advantage. Foont-Freedenfeld, 126 N.J. Super. at 257; Jewish Center of Sussex Cty., 86 N.J. at 624-25. In an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement and not monetary damages. Foont-Freedenfeld, 126 N.J. Super. at 257; Jewish Center of Sussex Cty., 86 N.J. at 625. See Gherardi v. Trenton Bd. of Ed., 53 N.J. Super. 349, 366 (App.Div. 1958). The object of these remedies is to restore the parties to the status quo ante and to prevent the misrepresentor from gaining benefit from the transaction. Prosser and Keeton, supra at 729.
The trial judge made no findings of facts nor from our review of the record does there appear facts, to support scienter on behalf of the Title Company. No "misrepresentation" was made and therefore insofar as the Enrights are concerned, there was no statement made with "knowledge of its falsity." *73 The certificate of title was issued, not to the Enrights, but to the Lubows. Since the Enrights already knew, as found by the trial judge, that the survey by Bailey was in error even before they signed the contract with the Lubows, there is no way that they could have been misled. Therefore, the Enrights could not have reasonably relied on the certificate of title issued to the Lubows by the Title Company through Inter-County Abstract on May 7, 1980. See DSK Enterprises, Inc. v. United Jersey Bank, 189 N.J. Super. 242, 250-251 (App.Div. 1983), certif. den. 94 N.J. 598 (1983); Prosser & Keeton, supra § 108 at 749, 754.

Duty of the Title Company to Plot the Easement
In conjunction with his findings of liability the trial judge found
[t]hat had the Title Company's attorney or abstractor plotted the Rockland Electric & Gas Easement, Bailey's error would have been discovered. I find that that [sic] Title Company had the duty to do that.
We find no basis in fact or law upon which to predicate a finding that the Title Company had a duty to plot the utility easement. A title insurer has three related duties under a title policy: (1) to indemnify the loss upon payment of damages; (2) to cure the title defects if feasible, and (3) to defend the insured in a judicial attack on its title. Cunningham, Stoebuck & Whitman, Law of Property, § 11.14 at 825 (1984). A title company owes no obligation to attempt to plot a utility easement traversing the property. That is the very purpose of an accurate survey; to prepare an accurate metes and bounds description of the easement which traverses the subject property and to properly locate the same.
Here the easement is not a local private right-of-way. It transmigrates for many miles both before and after it traverses the entire municipality of Montvale. Both surveyors, Bailey and Cassetta, specialists in measuring land and distances and plotting them on blueprints, testified as to the difficulty that *74 they had in plotting the particular utility easements involved in this matter. Cassetta stated that there was no way that by merely looking at the map and the Bailey survey could anyone properly determine where the easement was located because there were no tie distances shown on either of the two exhibits in evidence. Bailey testified that it would have been cumbersome, time-consuming and expensive to run the entire easement out by its description in order to find its location on the property. There is no basis in fact to impose a duty on a title company to plot the utility easement.

Compensatory Damages
Compensatory damages were measured as the difference between the purchase price in the sum of $182,000 in the agreement between the Enrights and the Lubows dated March 30, 1980 and the agreement in the amount of $160,000 entered into in March 1981 between the Enrights and the ultimate purchasers, William E. and Judith M. Ward. There are several different methods of measuring damages for losses under title insurance policies. 7 Powell, supra, ¶ 1054. In cases of encumbrances, it is generally held that the loss is the difference between the value of the property with the encumbrances or encroachment and its value without the encumbrance or encroachment. Id. at p. 92-57; Appleman, supra, § 5216 at 102; Annotation, "Measure, extent or amount of recovery on policy of title insurance," 60 A.L.R.2d 972, 984 (1958); Happy Canyon Investment Co. v. Title Ins. Co. of Minnesota, 38 Colo. App. 385, 388, 560 P.2d 839, 843 (Colo.Ct. of App. 1976); Overholtzer v. Northern County's Title Ins. Co., 116 Cal. App.2d 113, 253 P.2d 116, 125 (Cal. App.Ct. 1953). Contrary to the Title Company's contention the trial judge properly awarded $22,000 as compensatory damages, the difference between the value of the property with the encumbrance and its value without the encumbrance.

*75 Punitive Damages[1]
The trial judge awarded $30,000 punitive damages. Initially, we do not perceive that the punitive damage claim of the Enrights is based upon bad faith by the Title Company in initially refusing to pay the first-party claim. See Garden State Comm. Hosp. v. Watson, 191 N.J. Super. 225, 226-227 (App.Div. 1983; Milcarek v. Nationwide Ins. Co., 190 N.J. Super. 358 (App.Div. 1983). Rather, it appears that the Enrights' claim for punitive damages stems from the events occurring after April 1, 1980 when the claims office of the Title Company received the Enrights letter dated March 27, 1980 addressed to Inter-County Abstract. This conclusion is garnered from the conclusory statements of the trial judge in his oral opinion:
I further find that the Enrights sustained damages as a result of Bailey's negligence and the Title Company's negligence and deceitful conduct.
* * * * * * * *
I further find that the defendant Title Company acted with wanton disregard of the plaintiffs' rights. In other words, the defendant acted with knowledge that there was a high probability that their conduct would harm the Enrights, yet they were indifferent to this consequence. As to the amount of punitive damages, I say that the purpose of punitive damages is to punish wrongdoers and deter the commission of wrongful acts. In determining punitive damages, the factors which I considered were the nature of the defendant's acts, the manner in which the officers and title officers of the Title Company conducted themselves, completely ignored the rights of the Enrights and the Lubows.
We are not apprised of the facts upon which the findings of negligence and deceitful conduct are based; nor is the factual basis for the "wanton disregard of plaintiffs' rights" and defendants' knowledge "that there was a high probability that their conduct would harm the Enrights" delineated. Whether the trial judge was referring to the issuance of the certificate of title sent to the Lubows or its refusal to issue a title policy to the Lubows or both is not clear. In either event the rights of the Enrights were fixed by their title policy and we are at a loss *76 to understand what other rights of the Enrights were violated. Any obligations arising out of the issuance of the title binder and the refusal to issue a title policy because of the defective survey were to the Lubows, not the Enrights.
Punitive damages are only justified when there is a finding of: (1) actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act; or, (2) an act accompanied by a wanton and willful disregard of the rights of another. LaBruno v. Lawrence, 64 N.J. Super. 570, 575 (App. Div. 1960), certif. den. 34 N.J. 323 (1961). Accord, Di Giovanni v. Pessel, 55 N.J. 188, 191 (1970).
Something more than mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice" or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interest of others that the conduct may be called willful or wanton. There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as "gross." Prosser & Keeton, supra, § 2 at 9-10; Di Giovanni at 190 citing Prosser. To satisfy the requirement of willfulness or wantonness there must be a "positive element of conscious wrongdoing." That requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences. Di Giovanni at 191 citing Berg v. Reaction Motors Div., 37 N.J. 396 (1962). Otherwise stated, punitive damages are sums awarded when the wrongdoers conduct is especially egregious. Leimgruber v. Claridge Assoc., Ltd., 73 N.J. 450, 454 (1977).
It is error to award punitive damages if there has been no bad motive or wanton indifference. Restatement, Torts 2d, § 908, Comment d. at 466 (1977). Punitive damages are not awarded for mere inadvertance, mistake, errors of judgment and the like, which constitute ordinary negligence, nor are they *77 permitted merely for a breach of contract. Restatement, supra at 465.
Accordingly, we must examine the facts to decide the validity of the award of punitive damages in this case. LaBruno, supra, 64 N.J. Super. at 575. In this respect, we are mindful that if we are thoroughly satisfied that the findings and the ultimate conclusions are clearly mistaken and so plainly unwarranted that the interest of justice demands intervention and correction, we should appraise the record as if we were deciding the matter at inception in making our own findings and conclusions. Pioneer National Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App.Div. 1978), aff'd o.b. 78 N.J. 320 (1978).
To begin with, the trial judge made a finding that the Enrights were aware that the easement was not 50 feet but six feet from the house shortly before the contract with the Lubows:
MR. SLAVITT: Is your Honor making any finding of fact as to whether or not, or when the Enrights became aware of their particular title problem and that the easement was not 50 feet from the house but 6?
THE COURT: Yes. They became aware of it shortly before the contract with the Lubows. That's what you want to know?
MR. SLAVITT: Yes.
THE COURT: Okay.
The Enrights vigorously deny this and contend that they were only aware of a claim by Rockland Electric but that they had no proof of the problem and had no opportunity to discuss the matter with counsel until about April 10, 1980. The record amply supports the trial judge's findings that the Enrights knew of the problem concerning the location of the easement before the contract was signed.
On March 6, 1981 the Enrights wrote to the New Jersey Commissioner of Insurance setting forth the chronology of the events leading up to their problem concerning the location of the easement. The Enrights informed the Commissioner that on February 6, 1980 Rockland Electric advised them that the easement came within five feet of their home. They further *78 advised the Commissioner that they did their own research and concluded that there was a 50-foot variation in the location of the easement. They also apprised the Commissioner that on March 21, 1980, they received additional information from Rockland Electric concerning the information given to them by Rockland on February 6, 1980.
At trial Mr. Enright, a naval officer, admitted he plotted the location of the easement from documents on record at the County Clerk's Office and knew where the easement was located. This corroborated his statement concerning the research of all easements, maps and deeds as of February 15, 1980 in his letter of March 6, 1981 to the Commissioner of Insurance. Also, at trial Mr. Enright acknowledged that the location of this easement six feet from the house caused him to lose a sale in February 1980.
These two facts are further confirmed by the letter of March 27, 1980 from Mr. Enright to Lyons of Inter-County Abstract. There he states "Now that the right-of-way claimed by Rockland Electric Company is 50 feet closer to my house and thus within 10 feet, the impact will be severe." He continued and stated that
[t]his house is now for sale because of my change of work location. We have lost one sale because of the status of the right-of-way. Further, I do not know how any sale can be effected until the problem is resolved. Any further delay in sale jeopardizes my financial situation as I have contracted for another house and am counting on the net proceeds from this sale as down payment.
On April 11, 1980 the attorney for the Enrights wrote to Harold M. Cohen, attorney for the Lubows and enclosed a copy of the existing title insurance policy with a copy of the erroneous Bailey survey annexed. He advised that there was a "slight problem" with the survey and stated that "it has no effect at all upon the house or the use of the property other than the narrow strip." On the same day the Enrights attorney wrote to Inter-County and stated that "they must have a statement from your title insurance company that you will, in *79 fact, insure the survey prepared by Mr. Bailey so that we can market insurable title to any prospective purchaser."
At the conclusion of his opinion, the trial judge was asked as to whether the Enrights and Lubows relied upon the binder forwarded to them by Lyons of Inter-County. The following is the colloquy between counsel and the court.
MR. SLAVITT: I say, in your finding punitive damages against the Title Company, notwithstanding the fact that the act in sending out the binder was that of Mr. Lyons, who was A, no longer an agent of the Title Company; B, was acting contrary to instructions of the Title Company. and C, no one acted in reliance upon the receipt of that binder.
THE COURT: They did act in reliance. They set up a closing for it.
This finding is in error. Under the agreement of sale dated March 30, 1980 between the Lubows as purchasers and the Enrights as sellers, settlement was scheduled "on or before May 15, 1980 or three weeks after firm written mortgage commitment." The parties therefore did not schedule closing in reliance upon receipt of the certificate of title or binder; it had been previously scheduled.
Actually, as pointed out by the Lubows in their brief, on April 11, 1980 the attorney for the Enrights furnished a copy of the Bailey survey to the Lubows, who in fact had a copy in their possession well before settlement. They state that they relied upon the survey at the time they first received it from the Enrights. Therefore, there was no further reliance by the Lubows on the survey sent to them by Lyons of Inter-County Abstract on May 7, 1980.[2]
Nor can there by any reliance by the Enrights. They already knew of the problem. From the above correspondence it is quite obvious that the Enrights placed no reliance upon the fact that the certificate of title was sent to the Lubows. By the time they first notified the Title Company of the problem *80 concerning the easement, the Enrights were already aware of it for some six weeks; yet they expected the Title Company to evaluate the situation and rectify it or to issue a title policy after being made aware of the problem with the Bailey survey. They would have the Title Company compound the error with the Lubows by issuance of a title insurance policy for $182,000 to the Lubows and thereby increasing a known risk from $137,000 after it had been alerted to a probable error in the location of the easement. The Title Company owed a duty to the Lubows to apprise them of the actual facts which it was investigating rather than perpetuating and compounding the error by placing the Lubows in the same predicament as the Enrights found themselves.
There was no change in position between March 30, 1980 and May 15, 1980 that caused any harm or injury to the Enrights; and they were in the exact same legal and financial position on May 15, 1980 that they were on March 30, 1980. The certificate of title was issued by Lyons on May 7 and settlement had already been scheduled for May 15, 1980. Nothing transpired between those dates to change the position of the Enrights.
The claim for punitive damages seems to rest upon the issuance of a binder by Lyons on May 7, 1980 contrary to the instructions given to him by the claims office of the Title Company in New York. The trial judge undoubtedly was incensed over the flippant remark of Lyons when he attempted to justify his actions by stating "Let sleeping dogs lie." But this was not the attitude of Spiro, the paralegal of the Title Company from the claims office in New York. She ordered another survey from Bailey on April 23, 1980 and had not received it as of the date of the settlement. She felt that since the problem as to the location of the easement had been brought to her attention, the Lubows should be informed of it. Lyons, a carry-over agent and no longer a general agent for the Title Company, was acting in this matter simply because he had originally written the Enrights policy. He was winding up *81 prior business and had no interest in a future relationship with the Title Company.
Lyons' conduct in issuing the certificate of title cannot be characterized as malicious, reckless or willful either as to the Enrights or to the Lubows. He was acting more or less at the insistence and under the pressure of the Enrights who had taken somewhat the same attitude. Notwithstanding the problem of the easement, they encouraged the Lubows to proceed under the agreement as evidenced by counsel's letter of April 11, 1980 when he forwarded a copy of the survey "purporting to show the location of the easement" and reassuring that "it has no effect at all upon the house or the use of the property other than the narrow strip." Surely, counsel and Mr. Enright must have known or at least been aware of the fact that a utility easement such as the one here involved could not be relocated. The Enrights who themselves were aware of the problem concerning the location of the easement failed to mention it to the Lubows prior to signing the agreement.
The trial judge found that Bailey and the Title Company were guilty of "deceitful conduct" yet he failed to find that the five elements of fraud had been met. As we previously noted, from our review of the record there is no basis to sustain the element of scienter, nor was there a basis for a finding of justifiably reliance by the Enrights. D.S.K. Enterprises, Inc. v. United Jersey Bank, supra, 189 N.J. Super. at 250-251; Prosser & Keeton, supra, § 108 at 749-753. The Enrights knew the problem existed; they knew that the easement came within six feet of the house, and they knew or should have known that the easement could not be relocated. Notwithstanding this they entered into the agreement without informing the Lubows about the easement; they assured the Lubows that it had no effect upon the house or use of the house other than a narrow strip, and they further assured the Lubows that the Title Company would insure the survey and in some fashion expected the Title Company to ignore the problem and issue a title policy to the Lubows.
*82 We hold that the facts do not support a finding for punitive damages in favor of the Enrights against the Title Company.
Even if Lyons' actions would have justified an award of punitive damages, they may not be assessed against the Title Company. This is based upon the doctrine that generally, punitive damages may not be assessed vicariously against a principal for acts of an agent. See Winkler v. Hartford Acc. and Ind. Co., 66 N.J. Super. 22, 29 (App.Div. 1961), certif. den. 34 N.J. 581 (1961). The rule is stated in Restatement, supra, § 909.
§ 909. Punitive Damages against a Principal. Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
(a) the principal or a managerial agent authorized the doing and the manner of the act, or
(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
(d) the principal or a managerial agent of the principal ratified or approved the act.
The rule is based on the notion that it would be improper ordinarily to award punitive damages against one who is personally innocent and therefore liable only vicariously. Restatement, supra, § 909, Comment b. at 468; Prosser and Keeton, supra § 2 at 12.
Since Inter-County Abstract was an independent agency, it was not a "managerial agency." Nor is there any indication that Lyons, in spite of his direct disobedience of orders and his flippant remarks, was unfit. Not only was he unauthorized, but he was specifically directed not to issue the certificate or report of title; his action in forwarding the certificate of title was not ratified.
The Title Company's conduct was reasonable throughout. It ordered a second survey from Bailey which was received on May 19, 1980. This survey indicated that Bailey's first survey was in error and that the easement, instead of being 50 feet *83 from the house was within six feet of the house. The Title Company agreed to pay for another survey ordered by the Enrights attorney in June 1980 from Cassetta and Associates. On June 17, 1980 plaintiffs' attorney made a demand on the attorneys for the Title Company in settlement by the purchase of the home for $182,000. The title policy was for $137,000. The Title Company's attorney, on June 18, 1980, wrote to plaintiffs' attorney concerning the status of the survey and again wrote on July 18, 1980 on the same subject matter.
In early November, immediately after the Cassetta survey confirmed the location of the easement, the attorneys for the Title Company wrote to plaintiffs' attorney and agreed to have an appraiser appointed to assess the damages for the difference in the value of the property with the easement in its two different locations. Alternatively, they offered to have the court appoint an appraiser to make such a determination and the Title Company agreed to pay the difference in the value as reflected by that appraisal. In the meantime, the parties failed to reach an accommodation and suit was instituted. No loss or damage could have been sustained until the actual location of the easement was confirmed. See Miller v. Lawyers Title Corp., 112 F. Supp. 221, 227 (D.C.Va. 1953).

Counsel Fees
As to the Enrights and also the Lubows, the Title Company contends that the trial judge erred in awarding counsel fees citing Vesley v. Cambridge Mutual Fire and Ins. Co., 189 N.J. Super. 521 (App.Div. 1981), affirmed by an equally divided court, 93 N.J. 323 (1983). The Enrights contend that the $15,000 counsel fees are inadequate and that the counsel fees which were sought, $27,052.50 plus expenses of $1,531 is fair and reasonable. The trial judge in granting fees stated that "[w]e must bear in mind that these title policies are contract of adhesions," citing Sylvania v. Stein, 177 N.J. Super. 117 (Ch.Div. 1980). While Sylvania does recite that proposition, *84 id. at 119, there is no relation between insurance policies as contracts of adhesion and the allowance of counsel fees. Counsel fees may be allowed only as permitted by the rules of court, statute or contract.
In Kistler v. N.J. Mfgs. Ins. Co., 172 N.J. Super. 324, 331 (App.Div. 1980), this court explained the intent of R. 4:42-9(a)(6):
To our mind, R.4:42-9(a)(6) was never intended to apply to a direct monetary claim by an insured against his carrier but only to those situations in which an insured was constrained to bring suit to enforce the provision of a liability or indemnity policy whereby the carrier was obliged to defend and indemnify.
We followed the rationale of Kistler in Vesley and denied attorneys fees to a successful claimant who had sued his insurer on a fire casualty loss under his homeowners' policy.
As stated in Pressler, Current N.J. Court Rules, Comment R. 4:42-9(a)(6):
Since the stated intention of this rule was to permit an award of counsel fees only where an insurer refused to indemnify or defend in respect of its insured's third-party liability to another, it should not be extended, beyond its expressed terms, to permit a counsel fee award to be made to an insured who brings direct suit against his insurer to enforce casualty or other directed coverage. [Citations omitted].
In other words, the rule permitting an allowance of counsel fees involving claims against insurance companies does not extend to first-party insurance claims such as claims by an insured on fire, theft and collision policies. Here there is no claim against the Title Company for counsel fees incurred for failure of the Title Company to defend a title in breach of its indemnity contract. See McMinn v. Damurjian, supra, 105 N.J. Super. at 142.
We hold that there is no authority under R. 4:42-9(a)(6), statutes or equity to allow counsel fees to either the Enrights or the Lubows incurred in litigation of this matter. That part of the judgment allowing $15,000 counsel fees to the Enrights and $2,500 counsel to the Lubows is vacated.

Damages to the Lubows
As to the damages awarded to the Lubows, we initially pointed out that the certificate of title was a contract to *85 insure the title in accordance with the terms set forth in that document. Inasmuch as the Bailey survey was annexed and there was an agreement to insure the Bailey survey which the Title Company subsequently withdrew, then the Lubows are entitled to the actual damages awarded to them including the $500 counsel fee as an element of damage for preparation and attendance at settlement. The allowance of reasonable counsel fees is permitted where they are a traditional element of damages in a particular cause of action. Donovan v. Bachstadt, 91 N.J. 434, 448 (1982); See Dorofee v. Pennsauken Tp. Planning Bd., 187 N.J. Super. 141 (App.Div. 1982).

Indemnity
The trial judge awarded the Title Company indemnity to the extent of $22,000 against Bailey. The Title Company contends that it is entitled indemnity for the full amount of judgment against it. At this posture, the only additional damages allowed is $18,438.81 for interest. The record before us does not indicate the manner in which interest was calculated.
The general rule for indemnity is stated in the Restatement, Restitution, § 76 (1937);
A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payer is barred by the wrongful nature of his conduct.
The right of indemnity rests upon a difference between the primary and secondary liability of two persons, each of whom is made responsible under the law to an injured party. It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable. Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80 (1960) citing Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368 (1951). See Newmark v. Gimbel's, Inc., 54 N.J. 585, 600-601 (1969); Video Station v. Frey's Motor Express, 188 N.J. Super. 494, 499 (App.Div. 1983); Nevroski v. Blair, 141 *86 N.J. Super., 365, 385 (App.Div. 1976); cf. Rosenbloom v. Adler, 93 N.J. 324, 351 (1983).
The Title Company is responsible to the Enrights by virtue of its contractual obligation on its policy of title insurance. The obligation of the Title Company to pay stems solely from the error by Bailey in his survey in mislocating the utility easements. Under the circumstances the Title Company is entitled to full indemnity of $22,000 damages together with interest from December 1, 1980. We reject Bailey's contentions that the title company is jointly liable for the mislocation of the easement and that it is not entitled to full indemnity.

Judgment Against Bailey
Lastly, Bailey, insists that the judgment should be entered in the name of the corporate entity, Earle W. Bailey, P.E. & Assoc., Inc., a New Jersey Corporation. He points out that while the complaint does not indicate the corporate status, his answer and subsequent pleadings including the pretrial order indicate the status of the surveyor as a corporation. Be that as it may, our attention has not been directed to nor do we find in the record, any order changing the name or substituting Earle W. Bailey, P.E. & Assoc., Inc.
Undoubtedly, the caption could have been amended, and the corporation substituted as the proper defendant by the simple expediency of a motion, Mears v. Economy Brake Service, Inc., 78 N.J. Super. 218, 227 (App.Div. 1963), or even in the pretrial order. Moreover, the pleadings could have been amended even after the trial to conform to the evidence. R. 4:9-2. We are not informed as to the basis for the trial judge's refusal to substitute the professional corporation for the individual. The survey prepared by Bailey in the record before us dated June 23, 1978 merely has the name "Earle W. Bailey, P.E., L.S." with no corporate designation. Our attention is not directed to any arguments or rulings in the record before us addressed to the substitution of the corporate name. Absent any compelling *87 reasons to the contrary we decline to overrule the trial judge in determining that the judgment must be entered in accordance with the caption of the complaint.
Lastly, we reject the Enrights contention that certain damages should have been included in the judgment.
To recapitulate, the judgment is affirmed as to the allowance of $22,000 compensatory damages together with interest from December 1, 1980 in favor of the Enrights against the Title Company. The judgment is reversed as to the allowance of $15,000 counsel fees in favor of the Enrights and $2,500 counsel fees in favor of the Lubows against the Title Company. The judgment of $30,000 punitive damages in favor of the Enrights and against the Title Company and the allowance of prejudgment interest of $18,438.81 is reversed. The judgment of $3,452 in favor of the Lubows against the Title Company is reversed and judgment is entered in favor of the Lubows and against the Title Company in the sum of $952.
The matter is remanded to the trial court for entry of judgment consistent with this opinion.
NOTES
[1] The complaint does not assert any claim for punitive damages. The ninth count of the complaint, based on negligence, was amended at trial to assert punitive damages.
[2] The Enrights state that the certificate of title with the survey attached was sent to the Lubows by Ryan on April 16, 1980. The certificate of title is dated April 16, 1980 but was sent to the Lubows by a letter dated May 7, 1980 (Exhibit P-15) and presumably was not received until a day or so later.