Anant B. GOEL and Zarina
Goel, Plaintiffs,

v.

Steven B. HELLER, James J. Edgette, First Century Company, First Century Partnership II, Smith Barney Harris Upham Co., Defendants.

Civ. A. No. 86–5046.

United States District Court,
D. New Jersey,
Newark Division.

April 15, 1987.

7. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1966).

Clayton E. Dickey, Edward A. McConwell, Overland, Kan. and Stryker, Tams & Dill by Burtis W. Horner, Newark, N.J., for plaintiffs.

Fried, Frank, Harris, Shriver & Jacobson by Milton Eisenberg and Jack B. Gordon, Washington, D.C., and Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein by Phillip R. Sellinger, Newark, N.J., for defendants Smith Barney and First Century.

Schmeltzer, Aptaker & Sheppard by Stephen Horn, Washington, D.C., Gibson, Dunn & Crutcher by Wesley G. Howell, Jr., Washington, D.C., and Saiber, Schlesinger, Satz & Goldstein by Robin Horn, Newark, N.J., for defendants Heller and Edgette.

## OPINION

BARRY, District Judge.

### Introduction

Plaintiffs, Anant B. Goel and his wife Zarina,[1] bring this action against individual defendants Steven B. Heller and James J. Edgette, and the investment firm of Smith Barney, Harris Upham & Company and two related companies, First Century Company and First Century Partnership II (the "Smith Barney group"), alleging, in essence, three causes of action; fraud, civil RICO, and "indemnification." Heller and Edgette, together, and the Smith Barney group, now move to dismiss, or in the alternative for summary judgment. Because the court will rely upon materials outside the pleadings, the motions will be construed as ones for summary judgment.

For the reasons that follow, those motions will be granted.

### Facts

This case squarely places before the court the difficult and thorny problem of res judicata or "claim preclusion." A clear understanding of the issue now before the Court calls for a brief recitation of some recent—and sordid—history.

### The Case Known to the Parties as "Goel I"

The Goels are not strangers to litigation before this Court. On July 10, 1984, Entre Computer Centers, Inc. ("Entre"), a franchisor of retail computer stores brought suit against the Goels and their corporation Computomat, Inc. ("Computomat") in the United States District Court for the District of Virginia alleging violation of the franchise agreement controlling the Goels' operation, through Computomat, of a Entre retail outlet located in New Jersey. The action, *Entre Computer Centers, Inc. v. Anant Goel, et al.*, was subsequently transferred to this district (Civil Action No. 84–2699) and assigned to the Honorable Dickinson R. Debevoise.

On September 19, 1984, Entre moved for a preliminary injunction terminating the Goels' franchise and enforcing certain contractual obligations including a covenant not to compete. On October 11, 1984, Judge Debevoise found, after an evidentiary hearing, that the Goels had continuously perpetrated a major fraud upon Entre consisting of the "maintenance of a double set of reporting and accounting records designed to conceal from plaintiff the full amount of sales effected by defendants and thus avoid paying 8 percent franchise fees and the 1 percent advertising fund assessment." Transcript of Proceedings, August 15, 1986, Appended to Defendants Heller and Edgette's Memorandum in Support of Motion to Dismiss, at 9. On October 12,

---

**1.** As this opinion will explain more fully, the Honorable Dickinson R. Debevoise found in a proceeding collateral to the instant case that the plaintiff Anant Goel engaged in certain reprehensible, and perhaps criminal, activity. Judge Debevoise also indicated that Anant's wife, Zarina, while having knowledge of certain acts was, for the most part, acting at the direction of her husband. Therefore in recounting the activities of the Goels for the purpose of this memo references to "Goel" will indicate Anant Goel only.

1984, the Goels answered and asserted numerous affirmative defenses and counterclaims including fraud and other common law torts, civil RICO, various contract claims, Robinson-Patman claims, Sherman Act claims, and Clayton Act claims.

What followed after Judge Debevoise granted the motion for a preliminary injunction was, in his own words, "a series of extraordinary" events. On October 22, 1984, Judge Debevoise entered an order effecting his findings at the preliminary injunction hearing. The order prohibited the Goels, in keeping with the franchise agreement, from engaging, either directly or indirectly, in the sale of computer products within the geographical limitations found in the franchise agreement. Included in the injunction were provisions for the sale of the franchisee's inventory to Entre and a joint inventory to be conducted at the time possession of the franchise premises was turned over to Entre.

Instead of compliance with the court's order, the Goels engaged in numerous and serious acts calculated to both defy and deceive Judge Debevoise. On October 24, apparently under the cover of darkness, Goel and his agents loaded two tractor-trailers full of computer equipment from the Entre store and moved them to a warehouse in Wyckoff, New Jersey. On October 25, Judge Debevoise, after having heard of the violation of the preliminary injunction, issued an order restricting any further movement of the goods. Mr. Goel's counsel, with Mr. Goel present, assured the court that they would comply with the order.[2] Despite these assurances, on that very day and the next day, Goel participated in three separate shipments of goods from the Wyckoff warehouse. Judge Debevoise would later find these shipments to be in contempt of his orders. Transcript at 11.

As if active defiance of my brother's orders restricting the movement of goods were not enough, Goel then set out to contravene the twin pillar of Judge Debevoise's disposition of the injunction motion; namely, the enforcement of the restrictive covenant against competition. Sometime between October 11 and October 25, Goel ordered sales invoices imprinted with the name "Corporate Micros." ·This company, designed to be run out of the Wyckoff location, amounted essentially to a partnership between Goel and a Mr. Robert Utter, the man who controlled the Wyckoff location. Transcript at 13. On October 31, 1984 Utter and Goel met with their former counsel to incorporate their new venture and later in the day opened bank accounts with each as signatories. Deposits were soon made, some by Zarina Goel, representing sales to former customers of Goel's Entre store and on November 5, 1984 Goel wrote a check on the Corporate Micros account to pay the rent on the Wyckoff warehouse.

While the Court recognizes that doing something wrong is one thing and lying about it is another, it is clear that Goel did not lack the temerity to do either. On November 7, 1984, at a contempt hearing just two days after paying Corporate Micros's rent, the following colloquy occurred between counsel, Goel and Judge Debevoise:

Q. Mr. Goel are you currently engaged in buying or selling [computer equipment]?

A. I'm trying to work for a company so I can make a living.

Q. What is the name of the company? I'm sorry.

A. I said I'm trying to work for a company. I'm seeking employment.

Q. You're seeking employment?

A. That is correct.

Q. Do you currently at this time have any employees of your own?

A. I still have four of my employees from [Entre]. They're still on my payroll. And I still pay their salary. Yes.

Q. What do they do to earn their salary?

A. Nothing yet.

---

**2.** It should be noted that the Goels were not represented in *Goel I* by their present counsel. All counsel in the instant action have acted with the utmost professional competency and decorum.

Q. You're paying them salary for doing nothing?

A. That is correct. I have certain amount of loyalty to these people. They have displayed loyalty. They have a right to make a living. You put me out of business. That's fine. But I will not let them on the street. I will pay them as I'm willing and capable.

THE COURT: Mr. Goel, let's limit your answers to the questions.

THE WITNESS: I'm sorry, sir. I'm sorry.

\* \* \* \* \* \*

Q. Is [David Bombard] soliciting sales in your behalf?

A. Why would he do that?

THE COURT: Answer the question.

THE WITNESS: No. He's not.

Q. Are you familiar with a company called Corporate Micros?

A. Yes, I am.

Q. All right. What is it?

A. It's a corporation that I'm trying to work for.

Q. That you are trying to work for?

A. That is correct.

Q. Does that mean you have an application for employment pending with them?

A. That is correct.

Q. Have you done any work for Corporate Micros?

A. I'm starting to do work for them hopefully today, if I'm allowed to.

Q. What is it that you do?

A. Right now nothing.

Q. Who are the principals of Corporate Micros?

A. I don't know.

Q. You do not know. Do you know who it is who—who has hired you?

A. I'm not hired yet.

Q. Is there a person there with whom you have dealt?

A. Not yet. I'm supposed to meet the principals today or tomorrow, hopefully.

Q. Can you identify these principals?

A. I don't know.

Q. Can you name any person connected with Corporate Micros?

A. I don't know.

\* \* \* \* \* \*

Do you have an ownership interest in Corporate Micros?

A. No, I don't.

Q. Where are Corporate Micros' offices, if you know?

A. I don't know.

Q. Do you know what state they're located in?

A. I assume the state of New Jersey.

Q. No idea where they are?

A. I don't know.

Q. Do you know the phone number?

A. They were using a number, yes.

Q. What is that number?

A. 891–4569.

Q. That's right. Where is that—when one dials that number, where is it answered, if you know?

A. I assume at 681 Lawlins Road.

Q. Six—

A. 681 Lawlins Road.

Q. Is it correct Corporate Micros has a [sic] office at 681 Lawlins Road, Wyckoff?

A. I am in that office.

If this were not such a serious matter, this dance around the maypole of truth would be the kind of ludicrousness appropriate to a late-night television show. It certainly has no place in a court of law. Judge Debevoise would eventually find that Goel *was* Corporate Micros and that Robert Utter was little more than a passive investor. Judge Debevoise would also find that Goel engaged at least three other people to act as "fronts" for him so that he could continue in business in violation of the court's order and that Goel committed other acts to hide his wrong-doing.[3] But,

---

**3.** At one point Goel informed his employees to disavow any knowledge of a "Mr. Goel" and to address him henceforth as "Alan Goldberg." In addition, although Judge Debevoise did not make an express finding, it is clear that he found credible certain testimony, at one of the numerous contempt hearings in the case, of a former front for Goel to the effect that certain men who identified themselves by first name only visited the witness immediately prior to the

surprisingly enough, what eventually did Goel in, more than anything else, was his responses, or lack thereof, to discovery requests.

In May of 1985, Entre served two sets of interrogatories and other discovery requests on the Goels. When no answers were provided, Entre moved to compel. The Magistrate ordered compliance by August 2nd with fines for each day after the 2nd and the possibility of arrest after August 8th. The Goels finally answered the interrogatories on August 9th with responses that Judge Debevoise would eventually find, even with a subsequent 34 page supplement, "grievously deficient." Transcript at 4.

Based upon the perceived inadequacies of the answers and the failure of the Goels to participate in pretrial stipulations or otherwise assist in preparing for the scheduled pretrial conference, Entre moved for default. Despite the Magistrate's observation that "there is no sanction in the world that will cause these people, the Goels, to comply with a court order," Judge Debevoise granted the Goels "one last opportunity" to correct the "deficiencies" in their interrogatory answers. When the amended answers were received, Entre proffered evidence to show that many of the new answers were clearly perjurous.

After several hearings in which, after numerous witnesses and exhibits were presented, it became painfully certain that not only was Anant Goel continuing his own perjury but also had suborned the perjury of others, Judge Debevoise had clearly had enough:

> There is no reported case of which I am aware which deals with party misconduct as egregious as that which has occurred and is occurring in this case. The mere recital of what has happened leads to the inescapable conclusion the Court must, to preserve the integrity of the judicial process, impose the most severe civil sanctions available to it and refer the matter once again to appropriate law enforcement authorites.

hearing in an effort to convince the witness not

Transcript at 38. After finding that plaintiff had sustained its burden of showing that a default judgment in favor of Entre would be consistent with the factors set forth in the United States Court of Appeals for the Third Circuit's decision in *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863 (3d Cir.1984), including a brief discussion of the relative lack of merit in the Goel's counterclaim and what he described as the "corrupt and improper prosecution" of the case (T. 39), Judge Debevoise, in August of last year, entered judgment for Entre and dismissed, with prejudice, the Goels' counterclaim. An appeal of that judgment is now pending before the Court of Appeals.

*The Instant Action: Known to the Parties as "Goel II"*

Anant and Zarina Goel filed the instant action on December 24, 1986, approximately three weeks after the amended order was entered dismissing *Goel I*. Named as defendants are: Steven B. Heller, identified as the founder of Entre, its President, and a member of the Board of Directors from inception, ¶ 9; James J. Edgette, identified as a founder of Entre, its Executive Vice-President and a member of the Board of Directors from inception, ¶ 10; First Century Partnership II, identified as a venture capital company affiliated with Smith Barney, ¶ 11; First Century Company, a general partner of First Century Partnership II and also an affiliate of Smith Barney, ¶ 12; and Smith Barney itself. Also named are five "[u]nnamed co-conspirator[s]" two of whom are important for present purposes: Entre Computer Centers Inc., ¶ 4, and Michael J. Myers, who is identified as a Senior Vice-President of Smith Barney, general partner of First Century and the former designee of the Smith Barney Group on the Entre Board of Directors. ¶ 8.

The complaint is in three counts. Count I alleges common law fraud; specifically, that all of the defendants and Entre "created[,] approved and/or ratified ... false and untrue statements" designed to induce the Goels to enter into an Entre franchise in Union, New Jersey, which the Goels did

to "hurt" Mr. Goel.

in fact enter to their detriment. ¶¶ 89 to 94. Count II alleges a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.; specifically, § 1962(b) (all defendants acquired and maintained an interest in an enterprise through a pattern of mail and wire fraud); § 1962(c) (all defendants conducted and participated in the affairs of an enterprise through a pattern of mail and wire fraud); and § 1962(d) (all defendants conspired to violate subsections (b) and (c)). ¶¶ 95 to 102. Count III contends that all defendants are liable to the Goels for "contribution and/or indemnification" for any judgments against plaintiffs concerning any claim by Entre for royalties due. ¶¶ 103 & 104.

On January 30, 1987, defendants Heller and Edgette moved to have this case transferred to Judge Debevoise as a related case, to which Judge Debevoise observed that "this kind of case and this client should be shared among the judges in this District, and why should I have the good fortune to have him all to myself?" (Tr. Feb. 24, 1987 at 3). After wishing me "good luck", *id.* at 5, Judge Debevoise denied the motion.

All of the defendants now move to dismiss on the ground that the instant action is an improper attempt by the Goels to reassert the counterclaim dismissed by Judge Debevoise in *Entre Computer Centers, Inc. v. Anant Goel, et al.* and therefore must be dismissed as res judicata.[4] I now hold that because all of the defendants in this action are in sufficient "privity," as that term is defined by the law of this circuit, with the plaintiff corporation in *Entre v. Goel*, and because the claims here asserted are those dismissed in that case, each of the defendants is entitled to assert the defense of claim preclusion or res judicata. Accordingly, I will grant their respective motions to dismiss. I note that

4. While the defendants Heller and Edgette rely primarily on the res judicata defense, the Smith Barney defendants also assert numerous grounds for dismissal that attack the substantive elements of plaintiffs' claims. Because of my present disposition of the present motions I need not decide the alternative bases offered by

even if I err in so deciding, and I believe I do not, plaintiffs have received substantially more from the judicial system than their outrageous conduct warrants.

## Discussion

### The Defense of Res Judicata

That branch of res judicata now commonly known as claim preclusion was known to the common law as the defense of "merger and bar":

When the plaintiff obtains a judgment in his favor, his claim "merges" in the judgment; he may seek no further relief on that claim in a separate action. Conversely, when a judgment is rendered for a defendant, the plaintiff's claim is extinguished; the judgment then acts as a "bar." ... Under these rules of claim preclusion, the effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, *whether or not raised at trial* .... The aim of claim preclusion is thus to avoid multiple suits on identical entitlements or obligations between the same parties, accompanied, as they would be, by the redetermination of identical issues of duty and breach.

*Kaspar Wire Works, Inc. v. Leco Engineering & Machinery, Inc.*, 575 F.2d 530, 535 (5th Cir.1978) (emphasis added) (quoted in 18 C. Wright, A. Miller & E. Cooper § 4402 at 7 (1981)); *see Migra v. Warren City School Board of Education*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984).

In this circuit the question of whether or not the dismissal of the Goels' counterclaim against Entre in *Goel I* acts as a bar to the claims they assert against Heller, Edgette, and the Smith Barney group in Goel II turns on the resolution of a three-part test:

1) whether there has been a final judgment[5] on the merits in a prior suit;

the Smith Barney Group. However, I note, without deciding, that many of their defenses appear to be meritorious.

5. As defendants correctly point out, the Goels' notice of appeal under 28 U.S.C. § 1291 in *Goel*

2) whether the prior suit involves the same parties or their privies; and

3) whether the subsequent suit is based on the same causes of action.

*Purter v. Heckler,* 771 F.2d 682, 690 (3d Cir.1985); *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 983 (3d Cir.1984); see *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

### Was "Goel I" decided "on the merits?"

■ The first prong of the *Athlone* test is easily satisfied in the instant case by reference to the Federal Rules of Civil Procedure. Judge Debevoise based his dismissal of the Goels' counterclaim upon Fed.R. Civ.P. 37(d) and by reference (b)(2)(C) which provides that a judge faced with violations of Rule 37 may, if such a sanction is "just," "dismiss[ ] the action or proceeding or any part thereof, or render[ ] a judgment by default against the disobedient party[.]" *Id.* The effect of this involuntary dismissal is specified in Fed.R. Civ.P. 41(b) which provides that "[u]nless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision *and any dismissal not provided for in this rule* ... operates as an adjudication upon the merits." *Id.* (emphasis added). Since Judge Debevoise dismissed the counterclaim "with prejudice" and that dismissal derives from somewhere "not provided for in the rule," the dismissal of the Goels' counterclaim in *Goel* I was "on the merits." This interpretation of the rules is consistent with the expressed views of leading commentators, *see* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4440 at 362 (1981), and at least one court of concurrent jurisdiction. *Molinaro v. American Telephone and Telegraph Co.,* 460 F.Supp. 673, 676–77 (E.D.Pa.1978), *aff'd mem.,* 620 F.2d 288 (3d Cir.1980).[6]

### The Issue of Privity

The second prong of the *Athlone* test—whether the defendants in this case are in privity with the plaintiff Entre in *Goel* I—proves to be a more difficult question as to which the parties have drawn clear battle lines. Defendants contend that the law in this circuit suggests a broad or liberal interpretation of the definition of privity. Citing *Gambocz v. Yelencsics,* 468 F.2d 837 (3d Cir.1972) and *Bruszewski v. United States,* 181 F.2d 419 (3d Cir.1950), defendants advance a test of privity that examines whether "there is a close or significant relationship between successive defendants." *Gambocz,* 468 F.2d at 841.

Plaintiffs contend that *Gambocz* and *Bruszewski* are suspect as precedent because of more recent decisions of the Court of Appeals for the Third Circuit, *Purter v. Heckler,* 771 F.2d 682 (3d Cir.1985), and the Supreme Court of the United States, *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), which suggest a narrowing of the instances in which a court will find parties' interests to be the same. While *Purter* and *Brown* do suggest that courts should be careful to avoid

I estops the Goels from arguing that Judge Debevoise's dismissal lacked finality.

6. Plaintiffs, for their part, make no serious argument for the inapplicability of Rule 41, nor could they. They resort instead to a transparent attempt to distinguish *Molinaro* and the other case relied upon by defendants, *Syufy Enterprises v. American Multicinema, Inc.,* 575 F.Supp. 431 (N.D.Cal.1983), on the facts. Plaintiffs' attempt is unavailing. Nothing in either decision suggests that the peculiar facts of either case or the substantive area of the law involved skewed the courts' reading of the clear and unambiguous language of Rule 41. Nor do I pass on plaintiffs' not-so-thinly veiled comment that the preclusive effect of Rule 41 may not be a "valid or wise policy." That question is not for me, but rather for the Supreme Court.

Plaintiffs' further argument that Judge Debevoise never addressed the merits of the Goels' counterclaim is unsupported by the record. First, the Goels filed their counterclaim 10 days before Judge Debevoise entered the preliminary injunction. Clearly the very fact of the injunction supports the conclusion that the court believed that Entre had met its burden of demonstrating a likelihood of success on the merits. Second, plaintiffs' claim that Judge Debevoise never again considered the merits is simply false. The sixth factor of the *Poulis* test calls for a determination of the relative merits of the parties' cases. In making this finding Judge Debevoise said: "I have considered an extraordinary amount of evidence since the institution of this action. None of it disclosed fraudulent conduct on Entre's part." Transcript at 50.

a mechanical and "wooden" application of res judicata principles neither case provides any support for plaintiff's position. A careful reading of the *Purter* decision makes it clear that the court was concerned that the informalities of many administrative proceedings would render inequitable the strict application of res judicata to subsequent judicial proceedings:

> [W]e have ruled ... that when *res judicata* is applied in the context of administrative proceedings [where claimants are without the assistance of counsel and are not safe-guarded by adversarial concepts] ... it is not encrusted with the rigid finality that characterizes its application in purely judicial proceedings. *Purter*, 771 F.2d at 691–92.

Similarly, the *Brown* decision reflects a judicial sensitivity to the unique circumstances of the transfer of judgments from, or to, a specialized tribunal that may serve other interests than those traditionally advanced by res judicata. In *Brown*, the Supreme Court noted that in delineating the jurisdiction of the bankruptcy courts Congress clearly intended to confer upon them the power to carefully scrutinize state court judgments to ensure that they were of the narrow type that would not be dischargeable. *Brown*, 442 U.S. at 138, 99 S.Ct. at 2212–13.

Neither the concern for those who must travail the vagaries of the administrative labyrinth nor the concern that the purpose of the bankruptcy laws would be frustrated by the rigid application of res judicata are presented by the facts of this case. This court is confronted with the sound and reasoned decision of a court of competent and concurrent jurisdiction. There is no reason to suspect that any of the parties to this case would receive any more rights in my court than those afforded adversaries in my brother's court nor would any congressional purpose be frustrated. The only issue under the second prong of the *Athlone* test is whether Heller, Edgette, and the Smith Barney group have, or had, a close and significant relationship with Entre Computer Centers, Inc.

■ As to Heller and Edgette that question is clearly answered in the affirmative and one need look no further than plaintiffs own submissions.[7] Plaintiffs' complaint states that both Heller and Edgette are "founders" of Entre. ¶ 9 & 10. In fact, it is clear from the "general allegations" that at least in the early years Entre was nothing more than an idea carried around by these two entrepreneurs. ¶ 13 & 14. From there they incorporated, each providing half of Entre's initial working capital. ¶ 15. As their idea became a marketable one, Heller and Edgette became the point men for the sale of franchises. While it is apparently true that Entre eventually became too large to be a two-man operation, it is also clear that both Heller and Edgette are still closely aligned with Entre. To say that they are not in privity is to suggest that a father is not privy to his son. Clearly, not only would but-for Heller and Edgette Entre not exist but it would not exist in the shape and size it takes today.

■ I note that plaintiffs do not seriously suggest, nor could they, that the "John Does" named as third party defendants in *Goel* I did not include Heller and Edgette. One cannot invoke "John Doe" to avoid res judicata and relitigate claims *ad nauseum* when in large measure the acts and statements complained of and litigated in *Goel* I were those of Heller and Edgette. In a word, privity aside, Heller and Edgette were parties.

---

**7.** I categorically reject plaintiff's suggestion that *United States v. Webber*, 396 F.2d 381 (3d Cir. 1968) compels an evidentiary hearing to decide the issue of privity. While the question of privity does turn on the status of certain individuals and entities—questions of fact—the question of privity is really one of law. Plaintiff has pointed to no "contested facts" which call for resolution through live testimony. Their only prof- fer— that Heller and Edgette are less involved in Entre than they used to be—is simply irrelevant. The gravamen of the complaint clearly centers around their activities when Heller and Edgette, in plaintiffs' words, *were* Entre. Since those facts are clearly discernible from the record as it exists now, nothing in *Webber* requires the submission of additional proofs.

■ A much closer question is the issue of the identity or privity between the members of the Smith Barney group and Entre. Here, the critical focus is an "unnamed co-conspirator", Michael J. Meyers. Like many investment banking houses, Smith Barney engages in the risky but often enormously profitable business of investing venture capital in promising businesses. This kind of activity is a natural extension of Smith Barney's other endeavours. If the business is successful and decides to go public the firm's developed rapport with the principals makes it a natural choice to handle the public offering.

That is precisely what happened here. Smith Barney became interested in this young upstart company with a plan to capitalize on the rapid growth in the micro-computer industry. One of its venture capital units, First Century, invested heavily in the company and received as its reward a seat for Meyers on the Entre board, a perfectly legal and understandable effort to protect their investment. Eventually the company would boom and seek the further influx of capital—and profits to insiders—engendered by a public offering, all in the normal course of Smith Barney's business. Just as Heller and Edgette raised Entre to economic adolescence, Smith Barney, Meyers, and First Century contributed to Entre's maturity as a nationwide, publicly owned corporation. To say that the Smith Barney group did not have a "close and special relationship" with Entre would do violence not only to the common understanding of the phrase but also to the common understanding of modern business.

As if Heller and Edgette's and Smith Barney's efforts if analyzed alone are not enough to establish privity, a separate basis for such a finding exists from again examining plaintiffs' pleadings. The Goels allege that all of the defendants conspired to defraud them and to violate the substantive provisions of the RICO statute, hence the allegations of "co-conspirators." One of the co-conspirators is the plaintiff in *Goel* I, Entre Computer Centers, Inc. The *Gambocz* decision establishes as the law of this circuit—and the Goels have offered no authority to the contrary—that co-conspira-

tors are by definition in privity. *Id.* 468 F.2d at 842. Thus, plaintiffs' own theory of the case demonstrates the close and special relationship necessary for the application of res judicata.

### The Same Cause of Action?

■ The third prong of the *Athlone* test is whether or not the cause of action advanced in the successive action is the same as that advanced in the first. Of course, the mere fact that parties are in privity does not preclude subsequent lawsuits based upon different factual circumstances, or events wholly unrelated to the previous suit. What is barred are identical causes of action, not in name or form, but in substance:

> 'Rather than rest on the specific legal theory invoked, res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims . . . .'

*Athlone,* 746 F.2d at 983 (quoting *Davis v. United States Steel,* 688 F.2d 166, 171 (3d Cir.1982) *cert. denied,* 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983)). This view of the application of res judicata is "in keeping with 'the present trend [to require] a plaintiff to present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence.' " *Id.* at 984 (quoting J. Moore and J. Wicker, Moore's Federal Practice ¶ 0.410[1], at 359 (2d ed. 1983)).

The proper inquiry is whether a) the wrong for which redress is sought is the same in both actions, b) whether the theory of recovery is the same, c) whether the witnesses and documents necessary at trial are the same, and d) whether the material facts alleged are the same. *Id.* Putting aside for one moment the "indemnification" claim, it is clear that the fraud and civil RICO claims advanced in this action are the same as those advanced as counterclaims in *Goel* I.

First, the wrong complained of in each case is the same, namely that Entre and those in privity with it made knowingly false representations that induced the Goels to buy a franchise and then when

those representations proved to be false to the point where promised profits were not realized Entre and its agents moved in and took over the Goels' business.

Second, a simple comparison of the specifications filed in *Goel* I, see Appendix to Defendant Heller and Edgette's motion to dismiss Exhibit C, and the complaint in the instant case shows that in each case the Goels have espoused the exact same legal theories, fraud and civil RICO, in an attempt to remedy those perceived wrongs.

Third, in both *Goel* I and *Goel* II the Goels have proffered much of the same extrinsic evidence to document their claim. The evidence offered against the Smith Barney defendants is particularly illuminating. In *Goel* I, the Goels offered two Smith Barney documents to support their claim that knowingly false representations were made concerning pricing to dealers, the availability of IBM products, and anticipated profits. These same two documents, an internal Smith Barney memo listed in *Goel* I as defendant's trial exhibit 14, and the prospectus for the Entre public offering appended in *Goel* I as exhibit # 194 to the Goels' counterclaim, are resurrected here as proof of Smith Barney's knowledge of fraudulent misrepresentations.

Fourth, although it is clear that the Goels have fleshed out their allegations in the instant case more so than in *Goel* I, that distinction does not work to their advantage. The new facts alleged are material only to the extent that they illuminate the charges made in the earlier dismissed counterclaim and plaintiffs concede that "the operative facts are largely the same." Br. at 11. As the court in *Athlone* pointed out, "the overlap of irrelevant facts and probably even tangential facts constitutes nothing more than mere surplusage." *Athlone*, 746 F.2d at 986. That is a particularly apt description of the Goels' en-

hanced allegations of securities fraud. While the instant complaint is more specific as to the substance and sequence of the public offering, those facts are not alleged to show, for example, a violation of the securities laws, laws that would clearly give the Goels a private right of action albeit one that would most likely not succeed. Yet it is quite telling that the Goels have not sued under the securities laws. Thus, their allegations of securities fraud are only material to their fraudulent conspiracy and RICO claims, claims raised—and dismissed—in *Goel* I.

Finally, turning to the question of Count III, the count for "indemnification" by all defendants, it is clear that that claim could have and should have been raised in *Goel* I by way of third party complaint and is now barred.[8] Separate and apart from a mechanical application of res judicata principles, however, the rule has always been that res judicata is to be applied to accomplish fundamental justice, "... [and to further] public policy and private peace." *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299, 37 S.Ct. 506, 508, 61 L.Ed. 1148 (1917). Close scrutiny of Count III, a claim that the defendants indemnify the Goels for any judgment entered against them in favor of Entre, even assuming that it states a claim,[9] is nothing more than a transparent attempt to cast off upon another the effects of Judge Debevoise's entry of default. In other words, "If Judge Debevoise is going to make me pay, I'm going to make them pay." This court will not countenance such a result. Judge Debevoise reluctantly, and only after giving the Goels the benefit of the doubt, decided that their outrageous and contemptible conduct would not go unpunished. To allow the Goels to avoid sanctions through the device of indemnification would abrogate the strong public policy in favor of fair, honest, and expeditious judicial proceedings. *See*

---

**8.** In any event, the federal claim having been dismissed, and the parties not being diverse, the indemnification claim would be dismissed under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**9.** In order to state a claim for indemnification and contribution plaintiffs must become liable

for the torts of another without active fault of their own. *Enright v. Lubow*, 202 N.J.Super. 58, 493 A.2d 1288 (App.Div.1985). Plaintiffs are the *only* parties responsible for their contempt of Judge Debevoise's orders and for their knowing and willful perjury.

*Molinaro,* 460 F.Supp. at 677 (Rule 37 would be emasculated as an effective deterrent if dismissed parties could reassert their claims). To further these important goals and to foster private peace, Judge Debevoise's judgment will therefore be as unassailable in this court as it is in his.

It is therefore concluded that all of plaintiffs' claims having been raised, and dismissed, in a collateral proceeding, the doctrine of res judicata bars the litigation of those claims in this court. The court will enter an order granting defendants' motions for summary judgment. *Aetna Life & Casualty Co. v. McCabe,* 556 F.Supp. 1342, 1348 (E.D.Pa.1983) (summary judgment appropriate where prior adjudication binding upon parties).